COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Fulton[*] and Lorish
Argued at Fairfax, Virginia

GRAFTON SCHOOL, INCORPORATED

MEMORANDUM OPINION[**] BY
v.      Record No. 1302-24-4      JUDGE LISA M. LORISH
JANUARY 13, 2026

THE CITY OF WINCHESTER, VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF WINCHESTER
Alexander R. Iden, Judge

Stephen L. Pettler (Alan D. Bart; Harrison & Johnston, PLC; Reed
Smith LLP, on briefs), for appellant.

Heather K. Bardot (McGavin, Boyce, Bardot, Thorsen & Katz, PC,
on briefs), for appellee.

Following a bench trial, the circuit court determined that certain property owned by Grafton

School, Inc., doing business as Grafton Integrated Health Network ("Grafton"), was not tax exempt

under Article X, Section 6(a)(4) of the Constitution of Virginia. The court found that Grafton's

mission had changed such that it was no longer a qualifying "institution of learning" and that the

property in question (an administrative building and 18 motor vehicles) was not "primarily used for

educational purposes or purposes incidental thereto." While this appeal was pending, and with this

case in mind, the General Assembly unanimously passed Code § 58.1-3606.2 to define key phrases

in Article X, Section 6(a)(4). That statute instructs that "educational purposes" includes "special

education" and "related services" as defined in the federal Individuals with Disabilities

_____

[*] Justice Fulton participated in the hearing and decision of this case prior to his investiture
as a Justice of the Supreme Court of Virginia.

[**] This opinion is not designated for publication. *See* Code § 17.1-413(A).

Education Act (IDEA).  And it states that "institutions of learning" include institutions licensed by the federal Department of Education and those that provide services under the IDEA.

Grafton argues that the trial court erred in deeming its property subject to taxes even without considering Code § 58.1-3606.2, but that certainly following its enactment, it is clear that the properties in question are tax exempt.  The City of Winchester (the "City") argues that the circuit court's judgment was correct, that the new legislation is unconstitutional in any event, and that even if it is not, Grafton failed to prove that the property in question was primarily used for educational purposes or purposes incidental thereto under the definitions in the new statute.  For the reasons detailed below, we conclude that Code § 58.1-3606.2 applies to this case, vacate the circuit court's decision below, and remand for reconsideration under Code § 58.1-3606.2.

BACKGROUND

a. Grafton's History and Operations

Grafton was founded in 1958 and incorporated in 1960.  Its early purpose was to establish "an institution of learning for the instruction of youth, including physically or mentally handicapped youth, and to conduct . . . a private preparatory school or academy for the promotion of learning and education and for the teaching of [various educational subjects]."

But Grafton has evolved since then.  Around 2012, Grafton rebranded itself as "Grafton Integrated Health Network" and registered that name with the State Corporation Commission to do business under the same.  Grafton also revised its organizational purposes in its articles of incorporation and bylaws.  In 2018, for example, Grafton revised its "Scope of Services" to declare that it provided "integrated behavioral healthcare, special education, residential, medical, consultative, social and/or human services to improve the level of functioning and quality of life for individuals with psychiatric, intellectual and developmental disabilities, autism and/or behavioral impairment."  Grafton described its purposes as "[i]mproving community wellness" and

- 2 -

"[i]mproving the special education and health care industries as a whole, as well as improving the quality and cost-effectiveness of human services, in general."

Grafton's expanded and modern mission is also reflected in the breadth of its current programming. For instance, in its 2020 Annual Report, Grafton stated that it had served more than 1,000 "clients," including over 500 infants or toddlers, over 300 children, and approximately 300 adults. Recently, Grafton reported that it "provided education/day support services and/or residential treatment to 291 children/adolescents and 93 adults" at four locations in Virginia, including Winchester, Berryville, Leesburg, Richmond, and in Cold Springs, Minnesota. It provided "outpatient psychotherapy services" through a subsidiary. Additionally, Grafton operated the "Infant and Toddler Connection of the Shenandoah Valley" (the "ITC Program") in partnership with the City. "This service teaches, coaches, and mentors families of children up to age three who have a developmental delay or diagnosed disabling condition." The ITC Program served approximately 700 children in Virginia. Grafton also operated Ukeru Systems, through which it offered "consultative services" aimed at teaching "the Grafton Method, trauma informed care, and the elimination of seclusion and restraints including the sales of patented blocking pads." Finally, Grafton contracted with Loudoun County "to operate their youth shelter service, a short-term crisis response shelter program." Grafton's "therapeutic community living options" are accredited, as are its private day schools, and it is licensed by the Virginia Department of Education and the Virginia Department of Behavioral Health and Developmental Services.

Grafton's online presence exhibits the scope of its services. As of 2020, its "About Us" page described Grafton as "a multi-state behavioral health care organization serving children, adolescents, and adults with complex behavioral health challenges." On LinkedIn, Grafton described its "multidisciplinary team" as "including physicians, nurses, teachers, therapists, speech therapists, occupational therapists and direct service professionals." This team supports Grafton's

"integrated continuum of care—including educational, early intervention, outpatient, residential and short-term stabilization services as well as career and technical training."

       b.  Tax Exemption Dispute and Trial

Relevant here, Grafton owns several properties in Winchester. In 2019, Grafton acquired a property at 3150 Shawnee Drive in Winchester (the "Shawnee Drive Property"). Grafton initially obtained the office building with the hopes that it would become a school, but the current zoning prohibits the operation of a school on the premises. The property now houses numerous administrative functions. Additionally, Grafton owns several motor vehicles in Winchester, 18 of which were assessed for taxation. The 18 vehicles, which are registered in the City to "Grafton Integrated Health Network," are used primarily to transport students to and from Grafton's group homes, where the vehicles are parked overnight.

Also in 2019, the City determined during its tax assessment that Grafton had evolved beyond its founding as an "institution of learning." Because Grafton had become a "multi-state behavioral health care organization," the City claimed that (as to the Shawnee Drive Property and motor vehicles), it did not fit the constitutional tax exemption in Article X, Section 6(a)(4) for "institutions of learning" using property primarily for "educational purposes." Thus, the City sought to tax this property.

In response, Grafton filed suit seeking relief from an erroneous tax assessment. Grafton maintained that it was an "institution of learning" under Article X, Section 6(a)(4) and that the Shawnee Drive Property and motor vehicles were used for educational purposes.[1] The court held a three-day bench trial in July 2023.

At trial, Grafton called its president and CEO James Stewart to testify. Stewart described Grafton's "multidisciplinary approach" in partnership with local education authorities. He

---

[1] The parties stipulated that Grafton is a nonprofit organization.

explained that the shift in the way Grafton described itself over time was to better convey that Grafton provides "wraparound" services that support children beyond the classroom. He further stated that Grafton helped implement the individualized education plans developed by public schools for students in Grafton's programs. He also testified that Grafton's three schools are licensed by the Department of Education. Additionally, Stewart described the operations of Grafton's adult group homes, the ITC Program, and Ukeru.

Stewart's testimony also outlined the importance of the Shawnee Drive Property and motor vehicles in supporting Grafton's mission. He explained that Grafton "currently do[es] mostly administrative functions" at the Shawnee Drive Property, which are "needed to support [its] educational operations." This includes work involving quality assurance, accreditation, information technology, and more. He additionally stated that Grafton is required to provide transportation to the people it serves "as part of their daily living and [their] education, to get them interacted back into the community school, to take them into the community, to make sure they interact in the public or else they could not go back to their own school." According to Stewart, other forms of transportation are simply not available to Grafton's clients. However, Stewart could not identify each vehicle's individual role or current use, noting that some may be used for other supportive services.

For its part, the City introduced evidence to show that Grafton was less like a school and more like a healthcare provider. The City also introduced floorplans of the Shawnee Drive Property and photographs from a tour of the premises to support its claim that the property did not serve an educational function.

Following trial, the court declared that an "institution of learning" in Section 6(a)(4) is "an entity that seeks to advance the literary, scientific, or general knowledge of the population it serves." The circuit court then found that Grafton had changed since its founding and that the evidence did

not support Grafton's claim that it was an "institution of learning" or that the property was "primarily used for educational purposes or purposes incidental thereto." Accordingly, the circuit court determined that Grafton was not entitled to a tax exemption for the disputed property. Grafton timely appealed.[2]

### c. Post-Trial Legislation

On April 2, 2025, while this appeal was pending, the General Assembly passed a bill with direct implications for Grafton's case. The legislation, codified as Code § 58.1-3606.2, states:

> For purposes of the exemption authorized by Article X, § 6 (a)(4) of the Constitution of Virginia:
>
> "*Educational purposes*" shall include any special education and related services as those terms are defined in the IDEA.
>
> "*Institutions of learning*" shall include any institutions licensed by the Department of Education that provide services pursuant to the federal Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., or any school for students with disabilities in the Commonwealth that is licensed by the Board of Education pursuant to § 22.1-323.

The bill, which states that it is "declaratory of existing law," was passed unanimously as emergency legislation with immediate effect. 2025 Va. Acts ch. 645. An earlier version of the bill directly referenced the circuit court's ruling. The earlier version stated, "[I]t is the expressed intent of the General Assembly that this act overturn the holdings of the Circuit Court in *Grafton School, Inc. v. The City of Winchester*, Winchester Civil Action 20-530, and that the provisions of this act are declaratory of existing law." H.B. 1970 (2025).

### ANALYSIS

"This appeal requires us to resolve issues of constitutional interpretation and statutory construction. We resolve these purely legal issues de novo." *Va. Marine Res. Comm'n v.*

---

[2] The City assigns error to the circuit court's definition of "institution of learning." For the reasons discussed below, we will not address this assignment of error.

*Chincoteague Inn*, 287 Va. 371, 380 (2014). But "the issue of property tax exemption is a mixed question of fact and law and thereby must be reviewed de novo, giving deference to the trial court's factual findings." *Va. Baptist Homes, Inc. v. Botetourt Cnty.*, 276 Va. 656, 663 (2008).

I. The Exemption Framework at the Time of the Circuit Court's Ruling

Virginia's general policy is to tax "[a]ll property." Va. Const. art. X, § 1. With that said, Article X, Section 6 enumerates several tax exemptions. Prior to the adoption of the 1971 Constitution, the Article X exemptions were construed liberally. *See, e.g.*, *Richmond v. Southside Day Nursery Ass'n*, 207 Va. 561 (1966) (collecting cases). Under the 1971 Constitution, however, the exemptions must be "strictly construed." Va. Const. art. X, § 6(f). The 1971 Constitution also states that "[e]xcept as to property of the Commonwealth," the General Assembly cannot "extend" the exemptions outlined in Article X. Va. Const. art. X, § 6(c). The General Assembly may only "restrict or condition" the categories of exempted property. Va. Const. art. X, § 6(c).

Turning to the present case, Grafton argues it is exempt under Article X, Section 6(a)(4). This provision states that "the following property and no other shall be exempt from taxation, State and local, including inheritance taxes":

> Property owned by public libraries or by institutions of learning not conducted for profit, so long as such property is primarily used for literary, scientific, or educational purposes or purposes incidental thereto. This provision may also apply to leasehold interests in such property as may be provided by general law.

Va. Const. art. X, § 6(a), (a)(4).

The circuit court determined below that an "institution of learning" in Article X, Section 6(a)(4) is "an entity that seeks to advance the literary, scientific, or general knowledge of the population it serves." This definition is consistent with several opinions of the Attorney General, which have interpreted the phrase "institution of learning" following the strict construction rule

- 7 -

implemented in the 1971 Constitution.[3]  The court further reasoned that the primary purpose of the property in question was not for educational purposes or purposes incidental thereto, given Grafton's expanded mission.  But whether the circuit court was correct in its reasoning at the time of trial is not the question before us because, following the court's decision, the General Assembly enacted Code § 58.1-3606.2.

## II.  Code § 58.1-3606.2 Changes the Framework for This Case

Following the circuit court's ruling, and while this case was on appeal, the General Assembly unanimously enacted Code § 58.1-3606.2 and made it effective immediately, finding "an emergency exists and this act is in force from its passage."  2025 Va. Acts ch. 645.  Grafton contends that we must apply the newly enacted statute in deciding this appeal.

Conversely, the City argues that we should ignore Code § 58.1-3606.2 because the judiciary—not the legislature—must interpret the language of the Constitution.  But the Constitution expressly gives the General Assembly the authority to "define and classify taxable subjects."  Va. Const. art. X, § 1.  And our Supreme Court has long affirmed that the General Assembly has broad power to categorize tax exempt property under at least one constitutional provision, namely Article X, Section 6(a)(6).  *See Westminster-Canterbury of Hampton Rds., Inc. v. Virginia Beach*, 238 Va.

---

[3] "Opinions of this Office have established that, at a minimum, an 'institution of learning,' for purposes of Art. X, § 6(a)(4), must have a faculty, student body and prescribed courses of study."  1984-85 Op. Va. Att'y Gen. 320, 321 (citing several prior reports of the Attorney General).  Opinions of the Attorney General also reiterate that "[a] narrow construction of the phrase is mandated by Art. X, § 6(f)."  *Id.*  For example, a prior opinion of the Attorney General set out the considerations relevant to determining whether property owned by the MARC Workshop, a "non-profit corporation organized and operated to provide job training and low-paying jobs for certain mentally and physically handicapped persons" and which "trains and employs such persons to perform relatively simple manufacturing jobs," qualified for the exemption.  1976-77 Op. Va. Att'y Gen. 274, 275.  The opinion affirmed that an institution of learning "must have a faculty, a student body and prescribed courses of study."  *Id.*  While "job training of this type is admittedly educational in the sense that the trainees learn how to contribute to the manufacturing process, it does not involve the prescribed courses of study necessary for the trainer to be classified as an 'institution of learning' within the meaning" of the Constitution.  *Id.*

493, 501-02 (1989) (discussing the General Assembly's constitutional authority to create tax exempt classifications and designations).[4] The General Assembly used this broad power to enact Code § 58.1-3606, *Child., Inc. v. City of Richmond*, 251 Va. 62, 65-66 (1996), and to echo the constitutional language exempting property that is owned by institutions of learning and primarily used for educational purposes. *Compare* Va. Const. art. X, § 6(a), *with* Code § 58.1-3606(A). The most recent enactment, Code § 58.1-3606.2, interprets and defines these same terms.

With that said, the Supreme Court of Virginia has also recognized as a "fundamental principle[] of statutory construction" that "a statute is always construed to operate prospectively unless a contrary legislative intent is manifest." *Berner v. Mills*, 265 Va. 408, 413 (2003). But the City does not argue that Code § 58.1-3606.2 cannot apply to this pending case because it would be an improper retroactive application of law. This is no doubt because the General Assembly made clear its intent that the statute apply to this case.

Here, there is no question that the General Assembly passed the statute in response to the circuit court's ruling in this case. The bill, as originally introduced, stated that it was "the expressed intent of the General Assembly that this act overturn the holdings of the Circuit Court in *Grafton School, Inc. v. The City of Winchester*, Winchester Civil Action 20-530, and that the provisions of this act are declaratory of existing law." H.B. 1970 (2025). That the final version of the act stated only that it was declaratory of existing law without specifically mentioning the ruling in this case does not make the General Assembly's intention any less clear. In fact, the City recognizes this in

---

[4] Following a 2002 amendment to Article X, Section 6(a)(6), our Court has continued to refer to the General Assembly's powers under that section as "exceedingly broad." *Emmanuel Worship Ctr. v. City of Petersburg*, 80 Va. App. 100, 110 (2024) (quoting *Proceedings and Debates of the Virginia House of Delegates Pertaining to Amendment of the Constitution* 354 (1970) (Statement of Del. Morrison)). And the Supreme Court has continued to acknowledge the General Assembly's authority to interpret and define terms used in Article X. *Emmanuel Worship Ctr. v. City of Petersburg*, 300 Va. 393, 401, 403 (2022) (referring to the General Assembly's "interpretation" and "expansive definition of religious worship" as used in the Constitution).

its briefing before this Court: "it remains clear that the Clarifying Legislation, which attempts to define or interpret words in the Virginia Constitution, was for the purpose of attempting to overturn the Trial Court decision as this case works its way through the appellate process."

A statute may also apply retroactively where it was passed as an act of clarifying legislation. "Legislation is presumed to effect a change in the law" and thus apply prospectively only, "unless there is clear indication that the General Assembly intended that the legislation declare or explain existing law." *Chappell v. Perkins*, 266 Va. 413, 420 (2003). But a declaration of existing law is not a change in the law. Because a declaration of existing law "addresses . . . construction, not . . . substance," it may be used by the General Assembly to clarify existing law and settle a present controversy. *See Fink v. Ritchie*, 222 Va. 830, 837 (1981); *see also Boyd v. Commonwealth*, 216 Va. 16, 20-21 (1975) (per curiam) (noting that an act changes form, not substance, when it "merely interpret[s]" another statute to make it "more detailed and specific").

Once again, it is evident that the General Assembly intended Code § 58.1-3606.2 to be declaratory of existing law and to have immediate effect on the present litigation. For one, the act specifically states that the provisions are "declaratory of existing law."[5] 2025 Va. Acts ch. 645. The bill also passed unanimously, further suggesting the act was intended for this purpose. *See Graves v. Commonwealth*, 294 Va. 196, 205 (2017) ("[U]nanimity would be inexplicable unless the bill truly constituted a simple clarifying measure . . . ."). Most persuasively, as noted above, the bill as initially introduced referenced this very matter with the "expressed intent" to overturn the circuit court's ruling. H.B. 1970 (2025). This suggests the legislature intended to clarify any ambiguity in the language of the relevant exemption. The General Assembly clearly intended that Code

---

[5] Importantly, however, "declaratory of existing law" is not a magic phrase that automatically renders a statute retroactive in the face of other clear indications that a law was intended to only apply prospectively (such as when a statute is "reenacted"). *See Berner*, 265 Va. at 413-14.

§ 58.1-3606.2 be declaratory of existing law and operative immediately to this case, which remains pending on appeal.

Finally, we note that the disruption of vested rights is not a concern in a case like this. A taxpayer has no vested interest or right in the method or procedure used to determine the applicability of a tax exemption. Taxation is "the enforcement of a public right," so there is no "private right[] of [a] part[y], which ha[s] become vested by the judgment of the court, [that] cannot be taken away by subsequent legislation." *Norfolk v. Stephenson*, 185 Va. 305, 316 (1946). As such, the United States Supreme Court has repeatedly allowed the retroactive application of tax laws, noting that "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *United States v. Carlton*, 512 U.S. 26, 30-33 (1994); *see also Rafferty v. Smith, Bell & Co.*, 257 U.S. 226 (1921) (retroactively applying a statute that legalized and ratified taxes collected). If a taxpayer has no vested interest in a tax exemption, there is no reason a locality could have a vested interest in the same.

Considering the General Assembly's clear intent that Code § 58.1-3606.2 have retroactive effect and be declaratory of existing law, we find that it should apply to the present case.

III. The Record Is Not Sufficiently Developed to Determine Whether Grafton's Use of the Property Satisfies Code § 58.1-3606.2

"[A]ll exemptions shall be strictly construed against the taxpayer." *Mariner's Museum v. City of Newport News*, 255 Va. 40, 44 (1998). Therefore, "any doubt is resolved against the one claiming the exemption," and "[t]he burden is upon the taxpayer to establish that it comes within the terms of the exemption." *Id.* (quoting *DKM Richmond Assocs. v. City of Richmond*, 249 Va. 401, 407 (1995)). And as stated above, entitlement to a property tax exemption presents "a mixed question of fact and law and thereby must be reviewed de novo, giving deference to the trial court's factual findings." *Va. Baptist Homes, Inc.*, 276 Va. at 663.

"Exemption by classification requires the taxpayer to qualify for the exemption by fitting within the class of entities exempted." *Emmanuel Worship Ctr. v. City of Petersburg*, 80 Va. App. 100, 109 (2024). The City concedes that, should Code § 58.1-3606.2 apply to this appeal, Grafton meets the definition of "institution of learning" contained therein. Yet under the definitions set out in Code § 58.1-3606.2, Grafton must not only be an institution of learning, but the property at issue must also be "primarily used for literary, scientific, or educational purposes or purposes incidental thereto."[6]

Code § 58.1-3606.2 directs that "educational purposes" "shall include any special education and related services as those terms are defined in the IDEA." IDEA defines "special education" as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29). On the other hand, "related services"

> means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

---

[6] Code § 58.1-3606(A)(4) also states that the exemption "shall not apply to industrial schools that sell their products to other than their own employees or students." While Grafton does many things, it cannot be characterized as such a disqualifying "industrial school."

20 U.S.C. § 1401(26)(A).[7]  Importantly, Code § 58.1-3606.2 did not modify the explicit requirement that property be "primarily used" for these "educational purposes" to qualify for the exemption.  Article X(6)(a)(4); Code § 58.1-3606(A)(4).

The circuit court did not make any factual findings about whether the Shawnee Drive Property or the vans were primarily used for special education and related services as those terms are defined in the IDEA.  Nor would the court have had any reason to make such findings (given that Code § 58.1-3606.2 had not been enacted).  Even still, if it were nevertheless clear from the record below that Grafton met its burden to show that it qualified under the definitions in Code § 58.1-3606.2, we could issue a judgment reversing the circuit court's conclusion that Grafton was not tax exempt.  But we cannot reach that conclusion based on the record before us.[8]

An "appellate court . . . shall render final judgment upon the merits whenever, in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice."  Code § 8.01-681.  "Before entering final judgment, it should be reasonably apparent that the case has been fully developed in the trial court, or at least, that the parties had a fair opportunity of so developing the case," and the court "must be of the opinion that, upon the facts before us, the parties have had a fair trial on the merits of the case, and that substantial justice has been reached."  *Kearns v. Hall*, 197 Va. 736, 744 (1956).  Additionally, we must ensure that "all facts necessary for resolution of [the] appeal are contained within the . . . record."  *Ettinger v. Oyster Bay II Cmty. Prop. Owners' Ass'n*, 296 Va. 280, 288 n.3 (2018).

---

[7] However, "[t]he term does not include a medical device that is surgically implanted, or the replacement of such device."  20 U.S.C. § 1401(26)(B).

[8] Although Stewart broadly testified that the motor vehicles are used to transport the individuals Grafton serves, there was no specific evidence about whether the vehicles supported the type of services enumerated in the IDEA.  Similarly, with respect to the Shawnee Drive Property, Stewart generally testified that the functions performed there are "essential to Grafton's operation as an institution of learning," but there was no specific evidence about whether those operations aligned with the definitions in Code § 58.1-3602.2.

Where the factual record is insufficient for appellate review, remand is appropriate.[9] *Wolfe v. Shulan Jiang*, 83 Va. App. 107, 117 n.2 (2025) ("It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied." (quoting *Jones v. Willard*, 224 Va. 602, 607 (1983))). For this reason, we vacate the circuit court's decision and remand for further proceedings.

IV.  Remand Is Also Appropriate Under Principles of Constitutional Avoidance

As noted above, the City raises a constitutional challenge to Code § 58.1-3606.2 in its supplemental briefing filed after the passage of the law.  But we decline to address this argument for two reasons.

First, "[i]t is a 'fundamental and longstanding precept that . . . "unnecessary adjudication of a constitutional issue" should be avoided.'" *Harris v. Commonwealth*, 83 Va. App. 571, 580 n.2 (2025) (second alteration in original) (quoting *Grady v. Blackwell*, 81 Va. App. 58, 67 (2024)). "The constitutional-avoidance doctrine is 'an aspect of the "doctrine of judicial restraint" that "dictates that we decide cases 'on the best and narrowest grounds.'"'" *Id*. (quoting *Grady*, 81 Va. App. at 67).  We will not "rule upon the constitutionality of a statute unless such a determination is absolutely necessary to the decision of the case on the merits." *Klarfeld v. Salsbury*, 233 Va. 277, 286 (1987).  Furthermore,

> [t]he reason for this rule is that "no questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act, [and] it is the part of wisdom and a just respect for the legislature not to question the constitutionality of its action if the case may be determined on other points."

---

[9] This result is also consistent with the nature of our judicial system.  "Appellate courts are a court of review, not first view." *Commonwealth v. Holland*, 304 Va. 34, 38 (2025).  And "our function is to review the rulings of the trial court, rather than superintend the proceedings." *Brown v. Commonwealth*, 8 Va. App. 126, 131 (1989).  We recognize, as have courts before, that "the trial court is in a better position to inquire into and do what is right and just between the parties in the first instance than this court." *Craig v. Craig*, 115 Va. 764, 765 (1914).

*Id.* (second alteration in original) (quoting *Bd. of Supervisors of Henrico Cnty. v. Commonwealth*, 116 Va. 311, 312 (1914)).

Importantly, the circuit court might conclude on remand that Grafton cannot demonstrate that it qualifies for a tax exemption after applying the definitions from Code § 58.1-3606.2. If so, no determination about the constitutionality of the statute would be necessary. And even though "this case will be remanded and . . . the constitutional issue possibly may arise again," that possibility "does not dilute our obligation to adhere" to the constitutional avoidance doctrine. *Id.*

Second, Rule 3:14A entitles the Commonwealth to intervene in any action "in which a party challenges the constitutionality of a statute" and "no party is represented by the Office of the Attorney General." A party raising a constitutional challenge to a statute must thus "file with the court a notice stating the nature of the challenge and identifying the filing in which it was raised" and "serve a copy of the notice and the filing on the Attorney General" by regular or electronic mail. Rule 3:14A. The City failed to provide notice to the Commonwealth in this case.

Rule 3:14A was adopted in 2022. We do not yet have a decision regarding the failure to provide notice under this Rule.[10] However, Rule 3:14A states that

> if the party has failed to give the notice required by subsection (b) within 10 days after notice of such failure has been received by the party in writing, the court may reject the constitutional challenge but may not enter a final judgment holding the statute, regulation, or constitutional provision unconstitutional.

While the failure to provide notice to the Attorney General would preclude us from declaring the statute unconstitutional, we may have the authority to conclude the statute is constitutional.

---

[10] Our Rule is similar to, but not the same as, the federal rule requiring notice to a state attorney general, and the opportunity to intervene, when a case in federal court involves the constitutionality of a state statute. *Cf.* 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(a); Fed. R. App. P. 44(b). At least 29 states also have rules or statutes requiring similar notice and an opportunity to intervene when a case in state court questions the constitutionality of a state statute. Advisory Comm. on R. of Ct., *Proposed Rule Regarding Intervention by the Commonwealth Where the Constitutionality of a Law is Challenged* (2022), https://perma.cc/FP86-BTML.

Alternatively, we have the discretion to conclude that non-compliance with Rule 3:14A means an issue is waived.[11] *See* Rule 5A:1A(a).

Here, we conclude that the most prudential course is not to address the constitutional challenge. Should the City choose to raise a constitutional challenge on remand, it should follow the procedures outlined in Rule 3:14A.

## CONCLUSION

We vacate the circuit court's finding that the properties are not tax exempt and remand for the circuit court to apply Code § 58.1-3606.2.

*Vacated and remanded.*

---

[11] In some of our sister jurisdictions, the failure to provide notice has resulted in waiver of a constitutional challenge on appeal. *See, e.g.*, *Russell v. Masonic Home of Mont., Inc.*, 147 P.3d 216, 219 (Mont. 2006); *Buettner v. Buettner*, 183 S.W.3d 354, 358 (Tenn. Ct. App. 2005); *People v. Jenkins*, 224 N.Y.S.3d 20, 22 (N.Y. App. 1st Dep't 2024).